# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 3:19CR194(MPS) |
| v. | : | |
| JOSHUA BESAW | : | FEBRUARY 9, 2021 |

## GOVERNMENT'S SENTENCING MEMORANDUM

The government respectfully submits this memorandum in aid of Joshua Besaw's sentencing hearing scheduled for February 19, 2021. For the reasons outlined below, the government seeks a sentence within the applicable guideline range.

## INTRODUCTION

Joshua Besaw lured a twelve-year old child into his car, drove across state lines to a wooded area, sexually assaulted her and then abandoned her in an unfamiliar neighborhood. Words are insufficient to describe the trauma Besaw inflicted on the minor and her family. This trauma was exacerbated by his ability to avoid detection for 47 days – leaving the victim, her family, and the community in fear that he might return. Besaw further compounded the trauma by disparaging the victim and minimizing his own conduct, before and after he pled guilty, in a disgraceful attempt to cast himself as the person who was wronged.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Offense Conduct[1]

On May 31, 2019, a twelve-year-old girl (the "Minor Victim" or "MV") rode her bicycle to meet her friend at the May Street Park in Webster, Massachusetts. After waiting a few

---

[1] The Offense Conduct derives primarily from the PSR. There are no objections to the facts as set forth in the PSR.

1

minutes, the MV received a text from her friend and began riding her bicycle out of the park to a local convenience store.

As the MV was riding her bicycle, Besaw drove into the parking lot of the May Street Park. He called over to the MV saying, "Hey, can you help me?" He stated his name was "Chuck" and told the MV that he needed her help delivering money to his girlfriend because his girlfriend's father did not like him. Besaw offered to pay the MV money if she helped him. When she agreed to help him, Besaw directed the MV to lock up her bicycle. The MV reported that she was confused about why he wanted her to lock her bicycle, thinking she could just ride her bicycle to the girlfriend's house, but she complied.

The MV got into the front passenger seat of Besaw's car and he began driving. MV asked where they were going and Besaw replied that it was past the hospital. MV stated when they passed the hospital, MV asked about stopping and Besaw told her they were going to a house. MV noticed a sign with a "Th" that indicated they were going into another town. She questioned Besaw about whether they were leaving town. He lied, claiming that they were still in Webster.

While in the car, Besaw asked the MV if she had a boyfriend. He also asked where she lived and went to school. MV reported that she did not provide her address but told him generally that she lived near McDonalds and the name of her school. Besaw drove her to a wooded area and directed her to walk into the woods claiming that they were going to wait for his girlfriend there.

Once he got the MV alone, Besaw used different techniques in an effort to coerce the MV to engage in sexual acts with him. Initially, he tried to persuade and entice the MV by offering

her money and, when that did not work, he promised her release in exchange for certain sexual acts. When that technique failed, he turned to physical aggression and threats. *See* PSR ¶¶ 11-13. When the MV fought back, Besaw resorted to threats including that he "would hurt the MV if he had to" and claiming he had a gun (although he did not display one).

Ultimately, Besaw told MV that he would let her go if he could ejaculate on her face or in her mouth. MV said no but ultimately decided to remove her hands in the hopes that he would let her leave. After Besaw ejaculated on the side of her face, he dismissively stated, ""At least I didn't rape you, so be grateful for that."

After they were back in the car, Besaw told MV that he was forced to do what he did and that he just wanted to be MV's friend. MV asked to be returned to the May Street Park, but Besaw refused. Instead, he dropped MV off in an unfamiliar neighborhood in Dudley, Massachusetts. Besaw refused to return the MV's cell phone, which he had taken from her when they were in the woods.

After Besaw drove away, the MV tried to find someone to help her. Fortunately, she came across another juvenile who offered help. He walked her to his house, which is equipped with a "Ring" doorbell video surveillance. Upon arriving at the juvenile's house, MV appears to be emotionally distraught and fearful. When the juvenile went inside his house to get a wireless phone for the MV, the MV is alone on the porch. The Ring video shows the MV looking up and down the road and, at one point, when she hears a car approaching, she gets off the porch and hides behind the trash cans on the sidewalk.

After picking up the MV, her parents drove directly to the Webster PD to report what had happened. The MV gave a description of the perpetrator, including that he wore a bandana on

his head and a hat on top of the bandana. The MV went to the hospital for a Sexual Assault Evidence Kit, which including the collection of Deoxyribonucleic Acid (DNA) from the MV's face, neck, cheeks, and eyeglasses. In addition, debris from the woods was collected from the MV's hair.

From the moment the MV appeared at their headquarters, the Webster Police Department ("Webster PD") worked tirelessly to identify the perpetrator. Until he could be located, the Webster community remained in fear. https://boston.cbslocal.com/2019/06/01/webster-police-alleged-kidnapping-sexual-assault-12-year-old-girl-may-street-park (last visited 2/7/2021) (quoting a town of Webster resident: "It's scary for the people who live in the area, scary for the people who use the park on a daily basis") https://www.telegram.com/news/20190604/webster-police-seek-publics-help-in-probe-of-alleged-abduction-and-assault (last visited 2/7/2021) ("'No one's probably going to sleep great at night until we get this person prosecuted, which I'm confident we will,' Chief Shaw said"); Webster Kidnapping Has Parents On Edge - YouTube (last visited 2/7/2021) (CBS News report with parents expressing their concerns "it's like you're not safe anymore").

After a careful review of the information they collected, including hours and hours of videos from residences and businesses, the Webster PD identified Besaw as a possible suspect. On July 5, 2019, a cooperative team of local, state, and federal law enforcement began surveillance on Besaw. The surveillance confirmed Besaw was wearing a black bandana under a hat every day during the week-long surveillance.

On July 10, 2019, law enforcement surveillance observed Besaw smoke and discard three cigarettes. Law enforcement collected the cigarette butts after Besaw left the area and provided them to the Massachusetts State Police Crime Lab for analysis and comparison to the DNA

4

collected from the MV. On July 16, 2019, the Crime Lab issued its conclusion that Besaw's DNA profile matched the DNA collected from the MV with an "expected frequency of occurrence of this profile is approximately 1 in 610.5 octillion unrelated individuals."

On July 17, 2019, law enforcement executed an arrest warrant for Besaw and a search warrant for his car and residence. Besaw gave a recorded, post-arrest interview to the FBI and Webster PD. Throughout the interview, Besaw falsely denied any knowledge of or involvement in MV's kidnapping or assault. During the interview, Besaw denied that he used any drugs. While being transported to the courthouse, Besaw was exhibiting signs of withdrawal. Upon further inquiry, Besaw admitted that he uses approximately 2 bundles of heroin each day.

### B. Procedural History

On July 25, 2019, a federal Grand Jury returned a two-count indictment charging Besaw with kidnapping and transportation of a minor to engage in illegal sexual activity. On March 13, 2020, Besaw pled guilty to kidnapping.

### C. Post Guilty Plea Conduct

Approximately two months after he admitted his guilt in court, Besaw sent letters to two friends in which he minimized his conduct, blamed others for his conviction and maliciously claimed that the twelve-year old victim "ended up liking me" and only "told on him" because he took her phone. The following are selected excerpts from his letters, which are repeated in full in the PSR at ¶¶ 22-23:

- I accidentally tricked [the MV] into my car I just wanted to ask her something so I went for a ride with her.
- They [law enforcement] ruined my life… there[sic] crooked.
- I got fucked over so bad
- Don't listen to the news or papers that girl and police said a ton of lies fucked up lies that's how fucked up the police are.

5

- I don't deserve it [20 years' incarceration]
- I have to fit in like I'm a convict but I'm really not
- I'm going a lot of time in the feds for really nothing I wasn't even in my write fram [sic] of mind but they didn't care.
- they put a kidnap charge on me aint that crazy 20 years for nothing

## II.     GUIDELINES CALUCATION

The parties' plea agreement sets forth a guideline calculation resulting in an advisory guideline range of 240 to 262 months' incarceration. The PSR provides an alternative guideline calculation, but it reaches the same advisory guideline range.

## III.     DISCUSSION OF THE 3553 FACTORS

Title 18, United States Code, Section 3553(a) sets forth the factors a sentencing court must consider when determining a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing. Those factors are discussed below

### A.     <u>Nature and Circumstances of the Offense -- 18 U.S.C. § 3553(a)(1)</u>

Stranger abductions are among the rarest of crimes.[2] But, among those rare events, the defendant's crime was typical. Besaw lured the victim into his car. He appealed to her for help and confused her by getting her to agree to help him before he explained that she had to get in the car with him. *See* J. R. Collie & Karen Shalev Greene *Examining modus operandi in stranger child abduction: a comparison of attempted and completed cases,* https://researchportal.port.ac.uk/portal/files/12807930/Modus_Operandi_.pdf ("The term 'lure' describes a general approach used by the offender where some tactic or pretense was utilized in order to convince the victim to accompany them….[T]he key features of the lure …involve[es] the replication of "pro-social behaviours', demonstrating 'love, attention [or] appreciation'

---

[2] "Nonfamily abductions are the rarest type of case and make up only 1% of the missing children cases reported to [the National Center for Missing and Exploited Children]". https://www.missingkids.org/theissues/nonfamily

towards the intended target. The lure has been connected to exploiting the socially encouraged subordination of children to the authority of adults … as well as the predisposition of certain children to trust; a trait which offenders learn to identify, nurture and exploit .... *The weight of literature therefore suggests that one of the hallmarks of the lure approach is a lack of overt aggression*.") (internal citations omitted) (emphasis added).

Besaw gave the MV a false name ("Chuck") to protect himself and provided false reassurances during the drive from Webster to Thompson in an effort to keep her calm as he drove her out of town. He engaged her in conversation about her school and where she lived. Questions which later would leave the minor victim and her family worried that he might find her again.

He drove her to a wooded area near his home in Connecticut-- a familiar environment to Besaw, which allowed him to isolate the MV and maintain his control over her. When the minor began physically resisting him, he shifted from his initial tactics of manipulation and reassurance to more aggressive tactics, including threats, to get the MV to comply with his demands.

After the assault, he continued to show strategic thinking by refusing to return the minor to the May Street Park where there may have been witnesses. He also refused to return the minor's cell phone which would have helped the minor to be recovered more quickly and could contain evidence of investigatory value.

Defendant suggests that as a "heavy fentanyl user" he did "everything without thinking" and his brain was "clogged" when he kidnapped the MV. PSR at ¶¶ 26, 31.[3] Defendant's claim is belied by his actions. In fact, he showed control and clarity throughout the abduction. He

---

[3] He repeated this claim "several times" during his psychiatric evaluation. *See* Evaluation at 2.

7

manipulated, cajoled, and negotiated with the minor victim for the sex acts that he wanted; and when that did not work, he used a mixture of threats and force to get her compliance.

Besaw's conduct during the kidnapping is consistent with the findings in the psychological evaluation. *See* Def's Exh. B (the "Evaluation"). According to the Evaluation, the defendant "showed a mixed problem-solving style which included trial and error through the use of external feedback and an analytic style in which he mentally considers the problem and alternatives before taking action. *The combinations style is one that supports both planning and corrective reactions to changing events.* That is the combination style that allows for mental planning and creation of a multistep structure to guide action while at the same time being able to adjust plans and behaviors in response to feedback." *See* Evaluation. at 4 (emphasis added).

## B. History and Characteristics of the Defendant 18 U.S.C. § 3553(a)(1)

The defendant admits that his childhood was not plagued by the abuse and poverty that this Court sees far too often among defendants. Instead, he was raised in a loving family and, when asked, was unable to identify any negative childhood memories. PSR at ¶ 58. Even after he dropped out of school and was arrested for several offenses, including a domestic incident with his brother, Besaw's parents provided unwavering support. He is fortunate to continue having their support today.

While defendant reports a significant heroin and drug history, it is difficult to assess the veracity of his claim of suffering four overdoses. Throughout the PSR process and during his own psychological evaluation, Besaw has proven to be an unreliable personal historian. Instead, as discussed more fully below, he manipulates facts in an effort to control the narrative and to paint himself in a more favorable light. *See e.g.* Evaluation at 3 ("[Besaw] was more guarded

and defensive on personality tests where he minimized psychiatric problems and problem behaviors").

**Psychological Evaluation**

Prior to his guilty plea, the defendant was interviewed for a psychological evaluation. *See* Evaluation at 1. The Evaluation did not find any severe mental health conditions that impaired his judgment. However, it contains several findings that Besaw is self-centered, lacks empathy and blames others.

- On personality measures, the defendant was defensive and tended to attribute problems and personal short-comings to the actions of others, a lack of support and resources, and unjustified blame by others. Evaluation. at 4

- independent of addiction, Mr. Besaw's personality profile indicated a self-centered disregard for others as a trait. Evaluation. at 5.

- the testing showed antisocial characteristics that included avoidance of responsibility, limited empathy, and selfishness; these characteristics are enhanced by his long-term addiction. He focuses on addressing cravings and fulfillment of other desires, including sexual needs without regard for consequences, for him or others. The testing did not indicate physically violent tendencies, impulsivity or aggressive problem solving; rather he has a tendency toward manipulation of others and primary self-centered motivations. Evaluation. at 7.

The "lack of empathy" is fully on display when he describes his offense, "I never hurt anyone; I was giving her a ride and she liked me; I could tell." *See* Evaluation at 2; *see also* PSR at ¶ 30 (Besaw tells the probation officer that he did not perceive the minor victim to be upset).

In addition, the defendant demonstrated his manipulative behaviors by providing inaccurate information during the Evaluation and refusing to cooperate with certain testing. *See* e.g. Evaluation at 2 (Besaw "minimized personal flaws when describing himself"); *see also* Evaluation at 6 (Besaw refused to cooperate with testing relating to sexual deviance).

**Letters to Friends**.

Even after he admitted his guilt to this Court, Besaw tried to minimize his conduct and create the impression that he was the person who was wronged. His letters, written months after his guilty plea, are replete with false claims and victim blaming.

- "The [MV] was there she was at the wrong place at the wrong time. I accidentally tricked her into my car I just wanted to ask her something so I went for a ride with her." PSR at ¶ 22.

- "She ended up liking me but as I was dropping her off I took her phone from her and dropped her off in a different location not to[sic] far away tho maybe a mile away so she told on me." *Id.*

In addition to his lies, Besaw attempts to avoid any responsibility for his own actions and to project blame at law enforcement and his minor victim. *See e.g.* PSR at ¶¶ 22, 23

Besaw's recent letter to the Court, in which he expresses empathy for the victim and remorse for his actions, are dubious when viewed with his numerous prior statements – made to probation, the psychologist and to his friends – in which he portrays himself as the victim. Instead, the Government submits that Besaw has demonstrated very limited insight into his own behavior or recognition of the harm he caused.

### C. Seriousness of the Offense, Promote Respect for the Law, and Just Punishment 18 U.S.C. § 3553(a)(2)(A)

Child abductions are serious and traumatic offenses. They devastate families and the larger community. Stranger child abductions are among the worst fears of parents. Besaw preyed on a vulnerable teenage child and then continued to disparage the victim and others. The damage inflicted on the lives of his victim and her family families, and indeed his own family, is severe and enduring.

The seriousness of this offense is clear when reading the victim impact statements provided by MV and her family. The MV aptly notes that Besaw lied to her and that she "fell into his trap." PSR at ¶ 24. She describes feeling "panicked and confused" during the abduction. *Id*.

> I didn't know what to do and nobody was around to hear me. He even threatened me but I knew not to believe his lies anymore so for once I was happy I was stubborn. It crossed my mind when we were struggling that I may not get out of this with my life, but the thought of my family kept me going. It felt like hours but finally I got away from him. *He tried to cover his tracks with so many lies but I wouldn't let him get away with this*. So I'm happy it was me *so nobody else would have to suffer this.* Do I hate him? The answer is yes I do. So all I can ask for is to lock him up forever and prevent him from hurting anyone else. The last thing I must say is he messed with the wrong girl. Thank you"

*Id (emphasis added)*.

The MV's mother, grandmother and aunt provided victim impact statements which provide additional details and considerations relevant to the seriousness of the offense, just punishment and deterrence (both specific and general). Excerpts of their statements are set forth below. The full statements were provided to the Court.

- **MV's mother**: "I have had almost a year to try and articulate into words how I feel and how my life has changed. I was a strong woman and I believed I could protect my daughter from just about anything, well that day when I picked up my phone and my daughter was on the other end crying, telling me she was not ok and didn't know where she was broke me. The time it took to get to her felt like an eternity and finally when I saw her face crying I was so happy to see her and I told her everything is going to be ok now. As she started to tell us what happened I was in shock and went numb, I could not believe what I was hearing, my daughter had been kidnapped and sexually assaulted. While my daughter is telling us what happened my husband who is definitely the strongest person I know was crying hysterically and completely shattered. For hours of questions and listening to it I was sick to my stomach. No twelve year old girl should be having a sexual assault kit done to her, I don't wish any mother or woman for that fact to see or have one done….
Your honor in closing we are hoping for the maximum sentence, he knew what he was doing was wrong and still made every attempt to follow through with his plans. My

11

daughter fought and bargained for her life to get away from him. He may have 20 years to think about this but my daughter has the rest of her life, we don't know how this will affect her the rest of her life, will something trigger the thought of this at any given moment. We hope you show him the same respect he showed our daughter as he took her innocence and trust in people. Thank you."

- **MV's grandmother**: "My grandaughter is a different little girl. She went from being a beautiful, happy, fun, outgoing and loving to a quiet fearful, apprehensive and uncomfortable. When she comes to our home for sleep overs, she wants us to keep all the lights on and needs assurance that the doors are locked. What was once a happy loving environment has now become a fortress. Her childhood has forever changed. What once was a joyous, carefree child is now always looking over her shoulder. We don't see smiles, we see fear. God only knows how she will experience life as she gets older with this constant reminder. I also see how my daughter and son in law have been affected by this and it pains us equally…. We pray that your Honor imposes the maximum amount of time away from the outside world so that other children will be protected from him."

- **MV's Aunt:** "You an adult planned to go to a playground and stakeout an innocent girl trying to meet up with a friend. How pathetic are you to entice a young girl for your sick plan. You are a predator. The only place you belong is in jail. To prey on an innocent girl is reprehensible. For the longest time my niece didn't want to leave the house. She worried about interacting with others and afraid to meet up with friends. Even my sister was scared for her to leave the house. All the conversations we had were about her daughter and any updates on the case. Then that magical day when you get caught. As overjoyed as I felt I then began to think about how my niece would handle this. I was amazed when my sister told me that she wanted to go to court. The courage she displayed was impressive and amazing. While I know there will always be dates and reminders of what happened I see her get stronger all the time. This horrible act will always be a part of her life but will not define her."

A guidelines sentence will reflect the seriousness of the offense, promote respect for the law and provide just punishment for the defendant.

### D. Adequate Deterrence to Future Criminal Conduct 18 U.S.C. § 3553(a)(2)(B)

The abduction of a child from a park during broad daylight is a brazen crime that forever harms the child and her family as well as the broader community. There is a need for the Court's sentence to send a message to discourage similar acts by others.

### E. Protection of the Public From Further Crimes of the Defendant 18 U.S.C. § 3553(a)(2)(C)

The defendant attempts to reassure the Court about his risk of reoffending by arguing that he does not have a proclivity for minor children. However, his psychiatric evaluation was unable to render "any conclusions around a sexual disorder or his risk of reoffense". Evaluation at 6. Besaw was defensive and did not answer questions related to his sexual preferences. *Id.* Despite his refusal to cooperate, the Evaluation noted that, "[Besaw's] distortions related to his description of the young girl's interest in him and to his minimizing the extent of the violent sexual action against here[sic] are characteristics that have been associated with those who act in sexually deviant ways." *Id.*

Whether Besaw has a sexual interest in children is not dispositive of his dangerousness.[4] Research shows that sexual desirability is not the sole motivation for crimes against children. The offender also considers the availability and vulnerability of the victim.

> "The more dire and immediate their desires or needs, the more flexible the selection criteria become and the higher the risks both predator and offender are willing to take. Rarely do predators or offenders attempt to engage those who appear strongest, most adversarial, or well defended. In an effort to maximize the probability of success, ensure the maximum return for their efforts, and minimize the risk of injury or apprehension, both predators and offenders typically seek those who appear weak, isolate, and undefended. In children, as in nature, predators seek, identify, and exploit suitable prey that are perceived to be weak, naive, and unsupervised."

Lord, Wayne et al., *Comparative Patterns in Life Course Victimization: Competition, Social Rivalry, and Predatory Tactics in Child Homicide in the United States,* at 335-36.

---

[4] Defendant notes that his cellular phone was seized by law enforcement and "has not been made aware of any child pornography images being stored there or website searches performed on the device." Def. Mem. at 7. The defendant is correct that the Government seized a cellular phone that is believed to belong to Besaw, but law enforcement never sought a warrant to search the device. Information obtained after the phone was seized suggested that the phone would have limited evidentiary value for the kidnapping offense.

https://journals.sagepub.com/doi/pdf/10.1177/108876702237343 . In other words, even if an offender would *prefer* to engage in sexual contact with an adult, they may choose a child because they may not be able to overpower physically or manipulate an adult as easily as they would a child.

Besaw argues that a sentence of the mandatory minimum twenty years' imprisonment is adequate to deter him from committing crimes in the future but offers no reason why that would be true. Besaw's behavior -even a year after the incident- suggests he still views himself as the victim. The Government submits that the protection of the public from this defendant is a significant consideration when determining the sentence to be imposed.

F. **Any pertinent policy statement issued by the Sentencing Commission, 18 U.S.C. § 3553(a)(5)**

While not a policy statement, the application note in the Sentencing Guidelines makes it clear that Besaw's offense falls within the "heartland" of federal kidnapping cases." U.S.S.G. § 2A4.1, Application Notes ("Background: Federal kidnapping cases generally encompass three categories of conduct: *limited duration kidnapping where the victim is released unharmed; kidnapping that occurs as part of or to facilitate the commission of another offense (often, sexual assault);* and kidnapping for ransom or political demand.") (emphasis added).

G. **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. § 3553(a)(6)**

It is challenging to find other sentencing cases to present the Court for comparison. Each kidnapping case presents unique facts that are distinguishable from the present, such as the circumstances surrounding the kidnapping, the duration of the crime, the abuse suffered by the victim, and the criminal history of the defendant. *Compare United States v. McGuire,* 441 Fed.

Appx. 586 (10th Cir. 2011) (500 month sentence for the kidnapping of a 10-year old girl who was riding her bike; defendant restrained the victim and sexually assaulted her on multiple occasions during the 18 hours she was held captive; and then released her); *with United States v. Monroe,* 259 F.3d 1220 (10th Cir. 2001) (Defendant sentenced to 20 years' imprisonment for his involvement (along with a co-defendant) in the kidnapping of a minor who escaped after 2 hours. The co-defendants used a stun gun, sexually assaulted the minor and stabbed the minor multiple times causing life threatening injuries).

**Restitution**

The parties are in the process of negotiating an agreement to restitution. If an agreement is not reached, the Government will request the opportunity to supplement this sentencing memorandum with briefing related to the losses suffered by the Minor Victim.

**Conclusion**

Based on the foregoing, the Government submits that a sentence within the applicable guideline range is sufficient but not greater than necessary to satisfy the goals of sentencing.

> Respectfully submitted,
>
> JOHN H. DURHAM
> UNITED STATES ATTORNEY
>
>    */s/*
>
> NANCY V. GIFFORD
> ASSISTANT UNITED STATES ATTORNEY
> FEDERAL BAR NO. ct16324
> 450 MAIN STREET, ROOM 328
> HARTFORD, CT 06A103
> (860) 947-1101
> Nancy.Gifford@usdoj.gov

CERTIFICATE OF SERVICE

I hereby certify that on February 9, 2021, a copy of the foregoing Memorandum was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.

/s/
NANCY V. GIFFORD
ASSISTANT U.S. ATTORNEY